IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
October 10, 2001 Session

## KENNETH EUGENE VARNEY v. HEATHER LOUISE VARNEY ROEMER

**Appeal from the Circuit Court for Sumner County**
**No. 11824-C     Arthur E. McClellan, Judge**

_____

**No. M2000-03234-COA-R3-CV - Filed November 21, 2001**

_____

This is a post-divorce custody case in which Father alleged a change of circumstances due to step-father disciplining the two minor children in an inappropriate manner, Mother not being able to provide a stable and consistent home and school environment, the children experiencing emotional problems while in Mother's home, and Mother voluntarily relinquishing custody. The trial court found that Father failed to demonstrate a change of circumstances warranting change of custody. Although the two children had been living with Father, the court refused to change the initial award of custody to Mother. We find that the evidence preponderates against the trial court's determination regarding changes in circumstances and that, by focusing on one alleged incident of inappropriate discipline, the court failed to consider other circumstances relevant to the inquiry.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court**
**Reversed and Remanded**

PATRICIA J. COTTRELL, J., delivered the opinion of the court, in which BEN H. CANTRELL, P.J., M.S., and J. S. Daniel, Sp. J., joined.

Connie Reguli, Nashville, Tennessee, for the appellant, Kenneth Eugene Varney.

J. Robin McKinney, Jr., Nashville, Tennessee, for the appellee, Heather Louise Varney Roemer.

**OPINION**

The parties were divorced by an order entered August 24, 1993, which granted sole custody of their two minor children, born in January, 1989, and June, 1990, to Mother. The proceedings now on appeal originated with Father filing a petition for change of custody on February 5, 1998, alleging material and substantial changes in circumstances including: (1) physical and verbal abuse of the children by Mother's husband; (2) use of marijuana in the children's presence by Mother and her

husband; (3) Mother voluntarily giving custody to Father on January 4, 1998,[1] because she and the children had no home due to eviction; (4) children's attendance at three different schools during 1997-98 school year and their failure to attend regularly; and (5) Mother's failure to properly feed or care for the children when they were with her. This petition was dismissed on January 5, 1999, for failure to prosecute.

Father again filed a petition for change of custody on January 28, 1999, based on a reassertion of prior allegations and new allegations including physical abuse of the children by Mother's husband; the children's failure to attend school regularly; numerous changes of residence and schools in the past few years; altercations between Mother and her husband observed by the children; children not doing well in school; children's fear of the step-father; and the fact that Mother had relinquished custody to the maternal grandmother. The petition alleged that Mother had removed the children from school and had stated that she was relinquishing custody to her mother, who lived in Portland, where the children would attend another school.

The grandmother intervened to request she be granted custody of the children. That petition stated that Mother supported the petition, "Due to the undesirable situation with her current husband, she has chosen to remove the children from that situation . . . ." In the petition, the grandmother stated:

> since the Final Decree was entered, which granted sole custody of the children to the Mother, a material change of circumstances has occurred which warrants placement of the children with the maternal grandmother. The Mother, for reasons set forth herein and to be further detailed at the trial, is unable to care for the minor children on her own, at this time.

She alleged that Mother and the two boys had come to stay with the grandmother, on or about January 14, 1999, "after the mother's current husband administered discipline to the oldest child . . . in an unacceptable manner." The petition contained assurances that the boys would have no exposure to their stepfather while in the grandmother's custody. The petition also made allegations regarding the unsuitability of Father to have custody.

Mother, represented by the same attorney who filed the maternal grandmother's petition, filed an answer to Father's petition for change of custody in which she admitted that she had taken the children out of school when advised by authorities to remove the children from the presence of the stepfather after she learned that the stepfather had previously administered discipline in an inappropriate manner. She also admitted to changing residences several times, necessitating changes

---

[1]The parties entered into an agreement which stated that Mother was "voluntarily giving temporary custody" of the two minor children to Father because "at this time I am not able to provide a home [for] them." The agreement also waived child support from Father due to the fact "he is solely supporting our two children." The children were returned to Mother a few months later after she was able to establish a new residence.

in schools for the children. However, she alleged that the boys were currently residing with their maternal grandmother and doing well in school there. The answer was filed February 18, 1999.

After a hearing on February 19, 1999, the court entered an order on March 4, 1999, granting grandmother temporary custody and outlining provisions for natural parents' visitation, with Mother's visitation limited to the grandmother's home. The court also ordered home studies by the Tennessee Department of Children's Services of both Father's home and the grandmother's.

On August 27, 1999, the trial court entered an agreed order granting Father sole custody of the children.[2] Attorneys for Father and the maternal grandmother signed the agreed order stating it was the product of settlement between them of all matters currently pending before the court. The order established a visitation schedule for the maternal grandmother and included a statement that "the father and maternal grandmother are in agreement that the best interest of the minor children would be served by visitation [by Mother] being exercised in the home of the maternal grandmother and they further agree that the children shall not be exposed to the stepfather . . . under any circumstances."

On December 3, 1999, Father requested a restraining order against Mother and grandmother and filed a motion for contempt on the basis that grandmother allowed Mother to see the children outside of grandmother's home or supervision and Mother allowed the children to stay in her home with her husband, in violation of the agreed order entered previously. The petition also explained the prior history of this matter and asked that the agreed order be set aside and that the court dismiss the intervening petition of the grandmother. The court immediately issued a restraining order suspending visitation with Mother or the maternal grandmother.

Father filed a motion for pendente lite child support from Mother and for payment of one half of medical, dental, optical, and counseling expenses for the children.

A hearing was held on March 24, 2000, as a result of which the trial court vacated the agreed order which had been entered in August of 1999 on the basis that the purported agreed order denied Mother due process of law, notice, and a hearing on the merits of custody.[3] Finding that order void, the court ordered that Mother and Father have joint custody of the two children with Father having

---

[2]In a later filing, Father states that this matter was set to be heard in August of 1999, but that it was not heard because of the untimely death of the trial judge. Consequently, the parties "attempted to enter into an agreed temporary order . . . ."

[3]The agreed order included a paragraph acknowledging that the executing attorney represented the maternal grandmother "and the mother was initially informed by the attorney that, if the mother and the maternal grandmother disagreed on any of the terms of the settlement, . . . mother may proceed pro se or hire another attorney." Father's later petition stated that the agreed order had not been signed by Mother, who "represented herself pro se in this matter. And, in fact, [Mother] had an attorney forward a letter to the other parties in this matter stating that she did not agree with the terms of the order. In spite of this dissent, the order was entered by Judge by Designation . . . ." In the later filing, Father requested that the court set aside the previously entered agreed order.

3

principal physical custody until a final hearing could be held. The court gave both parties the opportunity to amend their pleadings.

Father essentially alleged that Mother had provided an unstable and unsafe environment for the children, and that this environment resulted in behavioral, emotional, and scholastic problems for the children. At the time of the hearing in June, the two boys had been living with Father for almost a year and had lived with their maternal grandmother for six months prior to that. Father also asserted that the children's problems had improved while they were in his custody.

After a trial on June 22, 2000, the court entered an order on August 11, 2000, which stated in pertinent part that Father:

> (a) failed to carry the burden of proof in establishing a material change in circumstance that would warrant change of custody; and (b) failed to establish that the behavior of the Defendant and or Defendant's husband pose a danger to the mental or emotional well being of the parties' minor children.

It is clear from the court's order that it considered one alleged incident of excessive corporal punishment as the lynchpin of the case. That alleged incident was the one which triggered Mother's decision to remove the children from her home and place them with her mother. It occurred in January of 1999, and was referred to in the grandmother's petition for custody. The trial court found:

> Factually, the key issue is whether Defendant's husband, Harness Keith Roemer, inflicted corporal punishment on the minor child . . . such as would warrant a change in custody. In resolving factually what occurred relative to the spanking, the Court has first considered the testimony of the minor child. The Court concludes that the child's testimony must be discounted in as much as the Plaintiff, in violation of the Order of this Court, discussed this case with the child on at least three (3) occasions. Further, based upon the child's overall demeanor, it is clear that the child's testimony relative to the "spanking" in question was greatly influenced by the Plaintiff and his attorney.

> The Court finds from a preponderance of the evidence, that the bruising evidenced in Exhibit #2 is more consistent with the testimony of Keith Roemer; the testimony of Cheryl Bonny [grandmother]; and, the testimony of Norman Belonger [grandmother's housemate]. In this regard, Norman Belonger clearly dislikes Keith Roemer, nevertheless, he clearly testified that when he and the grandmother took physical possession of the child within two (2) days of the alleged abusive "spanking" that there were no marks on the child's buttocks. The Court is of the opinion that the preponderance of the evidence reflects that the marks shown in Exhibit #2 were not the result of an abusive "spanking", but rather were the result of the child being hurt while playing on a trampoline.

4

Custody was returned to Mother with each party being responsible for his or her attorney fees and discretionary costs, and Father paid court costs. The trial court reiterated its holding in an order of October 25, 2000, denying Father's motion for new trial or to alter or amend the judgment.

Father appeals the ruling that there was no material change of circumstances to warrant change of custody; the trial court's failure to award child support to Father retroactively from July 1999 to August 2000; and the trial court's failure to request Mother to pay one-half of the medical expenses incurred while the children were in Father's care and custody. Mother appeals the court's denial of attorney fees associated with the proceedings. For the reasons below, we reverse the trial court's denial of a change of custody.

I.

Cases involving a request for change of custody of minor children are particularly fact driven. *Rogero v. Pitt*, 759 S.W.2d 109, 112 (Tenn. 1988). In such cases, the trial court has the widest discretion to order a custody arrangement that is in the best interest of the child. *Gaskill v. Gaskill*, 936 S.W.2d 626, 631 (Tenn. Ct. App. 1996); Tenn. Code Ann. § 36-6-101(a)(2) (1996). An appellate court's review of a trial court's findings in a custody dispute is *de novo* on the record, accompanied by a presumption of correctness. *Nichols v. Nichols*, 729 S.W.2d 713, 716 (Tenn. 1990); *Hass v. Knighton*, 676 S.W.2d 554, 555 (Tenn. 1984). An appellate court will not reverse such a decision, absent an error of law, unless the appellate court finds that the evidence preponderates against the trial court's findings. Tenn. R. App. P. 13(d); *Hass*, 676 S.W.2d at 555; *Massengale v. Massengale*, 915 S.W.2d 818, 819 (Tenn. Ct. App. 1995).

A decree awarding custody of children is *res judicata* and is conclusive on a subsequent application to change custody unless circumstances have changed in a material way so that the welfare of the children requires a modification of the previous order. *Long v. Long*, 488 S.W.2d 729, 731-732 (Tenn. Ct. App. 1972); *Hicks v. Hicks*, 26 Tenn. App. 641, 653-54, 176 S.W.2d 371, 374-375 (1943). Courts are empowered to change custody "as the exigencies of the case may require." Tenn. Code Ann. § 36-6-101(a)(1).

"Notwithstanding the importance of stability and continuity, intervening changes in a child's circumstances may require modifying an existing custody and visitation arrangement." *Adelsperger v. Adelsperger*, 970 S.W.2d 482, 485 (Tenn. Ct. App. 1997). However, a custody order cannot be modified absent a showing of new facts or "changed circumstances" which require an alteration of the existing order. *Woodard v. Woodard*, 783 S.W.2d 188, 189 (Tenn. Ct. App. 1989). There is no hard and fast rule as to what constitutes a change of circumstances. *Dantzler v. Dantzler*, 665 S.W.2d 385, 387 (Tenn. Ct. App. 1983). However, "changed circumstances" include any material change of circumstances affecting the welfare of the child or children, such as events occurring since the initial custody decision or changed conditions which could not have been anticipated by the original custody order. *Blair v. Badenhope*, 940 S.W.2d 575, 576 (Tenn. Ct. App. 1996).

Thus, the threshold question in a change of custody case is whether there has been a material change in circumstances. If the court finds that a material change of circumstances has occurred, then the court will proceed to determine if the best interests of the child dictate a change in the existing custody arrangement and to devise a custody arrangement that serves those interests. *Adelsperger*, 970 S.W.2d at 485. "In child custody matters the paramount concern of the Court is the welfare of the children and the rights of the parties will yield to that concern." *Dantzler*, 665 S.W.2d at 387; *see also Contreras v. Ward*, 831 S.W.2d 288, 289 (Tenn. Ct. App. 1991). In custody matters, the determining facts are infinite in their variety and "the supreme rule to which all others should yield is the welfare and best interest of the child." *Holloway v. Bradley*, 190 Tenn. 565, 571, 230 S.W.2d 1003, 1006 (1950). In any proceedings requiring the court to make a custody determination regarding a minor child, such determination shall be made upon the basis of the best interest of the minor child. Tenn. Code Ann. § 36-6-106.

The primary holding made by the trial court in this case was that Father "failed to carry the burden of proof in establishing a material change in circumstances that would warrant a change of custody." We find that the evidence preponderates against this finding.

At trial, Mother admitted that since 1998, they have moved at least six (6) times and the children have changed schools at least four (4) times. A school social worker who counseled the older son prior to his moving to his grandmother's testified to the problems he was having adjusting to the last move to a new school. The stepfather admitted that on more than one occasion he had spanked both boys using a wooden spoon. There was testimony of other violent episodes in the home involving the stepfather. There was ample testimony, including that of two social workers/counselors, that the boys were afraid of their stepfather.

The cause of bruising to the older son in January of 1999 was disputed, and the trial court determined that it was due to a trampoline accident rather than to the spanking incident to which the stepfather admitted.[4] While this incident, the bruising, the resulting investigation and the move of the children to their grandmother's may have triggered the initiation of this latest round of litigation, it was not the sole basis for Father's petition and is not the sole determinative of whether a change of circumstances had occurred since the initial award of custody.

The undisputed facts are that the two children had not lived with their mother since January of 1999. They lived with their maternal grandmother, where they were visited by their mother, from that date until July of 1999. At that point, they went to live with Father, where they remained until the trial court's order herein in August, 2000. These facts establish a change of circumstances

---

[4]As to the "spanking" incident in question, the stepfather admitted to spanking the children with a wooden spoon before they went to school because they chose to take the spanking rather than continue to have their TV privileges restricted. He stated that he told Mother he would give them this choice and told her he had spanked them while she was there; however, Mother did not recall seeing or hearing anything and stated she must have been in the shower or something when the incident occurred. Mother's defense at trial and now is that the bruises which appeared on the older child were the result of a trampoline accident. The child testified otherwise, and Father testified that he did not get the trampoline until the end of January, after this incident. The trial court credited Mother's version.

6

occurring since the initial award of custody which was not contemplated at the time of the original custody award. *Black v. Black*, No. 01A01-9801-CV-00056, 1998 WL 717309 (Tenn. Ct. App. July 1, 1998) (no Tenn. R. App. P. 11 application filed) (mother's sending child to father for school year due to financial and emotional difficulties in the mother's life and the child's remaining with the father for two years constituted material change of circumstances).

Mother voluntarily relinquished custody to the maternal grandmother. Pursuant to court order, the grandmother was given custody of the children temporarily while the Department of Children's Services conducted home studies of Father's home and of the grandmother's home, clear indication the court saw the issue at that point as which party, Father or grandmother, would be given custody. Remaining in Mother's custody was not an option given to the court. The judge before whom the proceedings had been pending died before he had a final hearing on Father's petition for a change of custody and the grandmother's petition. Apparently, the grandmother voluntarily gave the children to Father in July of 1999. Although the Agreed Order giving primary custody to Father was vacated by the trial court because Mother's rights were disregarded in that process, the testimony is clear that Mother was aware that Father had primary custody after July or August of 1999. She and her mother exercised visitation with the children and telephoned them at Father's house. Mother did nothing to request the children be returned to her until filing an Answer and Counter-Petition for custody in May of 2000, almost a year and a half after originally relinquishing custody. It was Father who requested that the Agreed Order be set aside; and it was only after Father sought a restraining order and sanctions for contempt that additional legal proceedings took place.

The evidence is undisputed regarding the fact that the children did not live with Mother, the party given sole custody in the original award, for eighteen months prior to the hearing. This situation was a material change of circumstances. Consequently, we reverse the trial court's finding that Father failed to establish a material change of circumstances sufficient to trigger an analysis of which placement would serve the children's best interests.

II.

Because there was a material change of circumstances, the second part of the analysis must be considered: whether a change of custody is in the best interest of the children. In determining the custody arrangement which will serve the best interest of the children, the court is to assess the comparative fitness of the parties seeking custody in light of the particular circumstances of the case, considering the relevant factors, which are the same in a modification proceeding as those criteria used in establishing the initial custody order.[5] *Ruyle v. Ruyle*, 928 S.W.2d 439, 442 (Tenn. Ct. App.

---

[5]Tenn. Code Ann § 36-6-106 provides:

In a suit for annulment, divorce, separate maintenance, or in any other proceeding requiring the court to make a custody determination regarding a minor child, such determination shall be made upon the basis of the best interest of the child. The court shall consider all relevant factors including the

(continued...)

1996); *In Re Parsons*, 914 S.W.2d 889, 893 (Tenn. Ct. App. 1995); GARRETT, TENNESSEE DIVORCE, ALIMONY AND CHILD CUSTODY § 26-5 (1998).

In *Bah v. Bah*, 668 S.W.2d 663 (Tenn. Ct. App. 1983), this court established some guidelines for determining the best interest of a child:

> We adopt what we believe is a common sense approach to custody, one which we will call the doctrine of "comparative fitness." The paramount concern in child custody cases is the welfare and best interest of the child. *Mollish v. Mollish*, 494 S.W.2d 145, 151 (Tenn. Ct. App. 1972). There are literally thousands of things that must be taken into consideration in the lives of young children, *Smith v. Smith*, 188 Tenn. 430, 437, 220 S.W.2d 627, 630 (1949), and these factors must be reviewed on a comparative approach:
>
> "Fitness for custodial responsibilities is *largely a comparative matter*. No human being is deemed perfect, hence no human can be deemed a perfectly fit custodian. Necessarily, therefore, the courts must determine which of the two or more available custodians is more or less fit than others." *Edwards v. Edwards*, 501 S.W.2d 283, 290-291 (Tenn. Ct. App. 1973) (emphasis supplied).

*Bah*, 668 S.W.2d at 666.

In the case before us, the trial court did not make any findings related to the best interest or comparative fitness analysis since the court found there was no material change of circumstances. While the record before us contains some evidence on the factors to be considered, we are reluctant

---

[5](...continued)
following where applicable:

(1) The love, affection and emotional ties existing between the parents and child;
(2) The disposition of the parents to provide the child with food, clothing, medical care, education and other necessary care and the degree to which a parent has been the primary care giver;
(3) The importance of continuity in the child's life and the length of time the child has lived in a stable, satisfactory environment;
(4) The stability of the family unit of the parents;
(5) The mental and physical health of the parents;
(6) The home, school and community record of the child;
(7) The reasonable preference of the child if twelve (12) years of age or older. The court may hear the preference of a younger child upon request. The preferences of older children should normally be given greater weight than those of younger children;
(8) Evidence of physical or emotional abuse to the child, to the other parent or to any other person; and
(9) The character and behavior of any other person who resides in or frequents the home of a parent and such person's interactions with the child.

to make such findings ourselves. In view of the changes the children have undergone since the trial court's order, we are of the opinion that a determination of the best interest of the children should be based on more recent information. For example, there was testimony about the oldest son's behavioral and emotional problems as well as difficulties at school. Father testified those problems had decreased or been eliminated during the time the children lived with him and had no exposure to the stepfather. The duration, extent, and cause of those problems were disputed by Mother. The welfare of these children is of prime importance, and a decision on custody should take into consideration their progress and their current condition. Therefore, we remand this case for a determination by the trial court of a custody arrangement which will serve the best interest of the children. We also direct the court to set the matter for hearing as expeditiously as possible.

## III.

Father also requested that the trial court award him back child support and certain expenses for the time he had custody of the children. The trial court did not specifically rule on this request, and that silence is in effect a denial. Mother was never ordered to pay child support when she relinquished custody to her mother, and Mother was not a party to the agreed order and was, therefore, not ordered to pay support at that time either.

However, every parent is obligated to support his or her children during their minority. Tenn. Code Ann. § 34-11-102. The obligations of parents to support, care for and nurture their children are joint, and the extent of their duty to support depends on their ability to provide that support. *State ex rel. Grant v. Prograis*, 979 S.W.2d 594, 600-01 (Tenn. Ct. App. 1997). If necessary, the courts may apportion the responsibility for support between the parents according to their respective abilities to provide support. *Id.* at 601. Accordingly, relevant statutes and regulations governing child support are intended "to assure that children receive support reasonably consistent with their parent or parents' financial resources." *State ex rel. Vaughn v. Kaatrude*, 21 S.W.3d 244, 248-49 (Tenn. Ct. App. 2000).

This obligation to provide support exists without a court order. For example, in *Kaatrude*, the biological father was unaware he had a child until the Department of Human Services, on behalf of the mother, initiated proceedings to establish paternity and to obtain past and future child support when the child was fifteen years old. When blood tests confirmed he was the child's biological father, Mr. Kaatrude indicated his willingness to pay support prospectively. This court affirmed the trial court's determination that he should also pay child support going back to the birth of the child. 21 S.W.3d at 248. In explaining the reasons for an award of back support, this court stated:

> Mr. Kaatrude's duty to provide support existed during all those years, and his lack of financial assistance during that time either required Ms. Vaughn to shoulder more than her share of the support responsibility or, more likely, caused the child to get by with less. An award of back child support fills this gap.

*Id.*

With regard to the proper amount of back child support in *Kaatrude*, we vacated the $50,000 award ordered by the trial court because there was no evidence introduced at trial which established that the amount of the award bore a "traceable relation to Mr. Kaatrude's actual ability to support his son from 1981 to 1996." *Id.* at 249. Determining that the record did not allow us to do complete justice, we remanded the case to the trial court to calculate the father's back child support using the child support guidelines, with specific instructions that the parties should be permitted to present evidence concerning the father's earnings for the relevant years. "Based on this evidence, the . . . court should then determine Mr. Kaatrude's back child support obligation for each year based on the guideline percentage applicable to that particular year." *Id.* at 250; *see also*, *State Dep't of Human Servs. v. Springs*, 976 S.W.2d 654 (Tenn. Ct. App. 1997) (affirmance of trial court's award of back child support in a paternity action, calculated by applying the guidelines instructions to the father's gross monthly income during the years from the child's birth until his majority).

The record herein does not provide sufficient evidence for us to determine the extent, if any, of Mother's obligation for back child support. Accordingly, we remand this issue to the trial court for appropriate proceedings and a determination.

IV.

For the reasons stated herein, the order of the trial court is reversed. This cause is remanded to the trial court for determination of the custody arrangement which will serve the best interest of the children. In addition, the court shall determine whether Father is entitled to an award of past child support and set the amount of such support if any is due. Costs of this appeal are taxed to Mother for which execution may issue if necessary.

_____
PATRICIA J. COTTRELL, JUDGE